UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SANTANA J. GRAY,

        Petitioner,

          v.                         CAUSE NO. 3:23-CV-1079-CCB-SLC

WARDEN,

        Respondent.

OPINION AND ORDER

Santana J. Gray, a prisoner without a lawyer, filed an amended habeas corpus

petition under 28 U.S.C. § 2254 to challenge his conviction for murder and attempted

murder under Case No. 49G06-809-MR-215540. Following a jury trial, on September 13,

2009, the Marion Superior Court sentenced him to ninety years of incarceration.

In deciding this habeas petition, the court must presume the facts set forth by the

state courts are correct unless they are rebutted with clear and convincing evidence. 28

U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence

presented at trial:

> On September 16, 2008, Gray broke into Anthony Jenkins' home on
> Dearborn Street in Indianapolis. Jenkins caught Gray, made him take off
> his clothes, and forced him to leave naked. A neighbor, David McDonald,
> saw Jenkins push Gray out of his house.
>
> Soon thereafter Jenkins went down the street to where his aunt, Keisha
> Journey, lived. Williams, one of Jenkins' uncles, was at Journey's house
> working on a car. Jenkins told Journey and Williams about the incident,
> but did not mention Gray's name. Jenkins left Journey's house and
> returned after a few minutes. A man quickly approached Jenkins and fired
> several shots. Williams ran up to the shooter and "bear hugged" him. The

man shot Williams in the thigh, and Williams fell to the ground. Williams and Journey heard the gun click several more times, but the gun did not fire. The shooter then ran away.

Jenkins' wounds were fatal. Williams was hit in his femoral artery and had blood "squirting out" from the wound. Some neighbors applied pressure with a shirt and used a belt as a tourniquet, and Williams survived.

Several people called 911, but before the dispatch was sent out, someone flagged down Officer Michael Leepper. Officer Leepper broadcast a description of the shooter, and a perimeter was set up around the scene. Officer Matthew McDonald was stationed at 9th and Tuxedo Streets as part of the perimeter. After about half an hour, Officer McDonald drove a short distance down 9th Street and noticed a car stopped three or four feet from the curb. Gray approached the car.

Officer McDonald called out to Gray, but Gray did not respond and got in the car; however, Officer McDonald was not certain Gray heard him. Officer McDonald followed the car and stopped it about three blocks from Journey's house.

He had Gray get out of the car, and he placed Gray in handcuffs. As he was handcuffing Gray, Officer McDonald noticed Gray had blood splatter on his arms and legs. Other officers brought David McDonald and Journey to the traffic stop to see if they recognized Gray. David identified Gray as the person Jenkins had thrown out of his house, and Journey identified him as the shooter.

The police then took Gray to the police station, where they photographed him and took his clothing he was wearing as evidence. Blood on Gray's shoes matched Williams' DNA profile. The police searched Jenkins' house and found the clothing Jenkins had forced Gray to remove earlier that day.

In Gray's pants, police found keys for Gray's blue Camaro, which was parked behind Jenkins' house.

Gray was charged with the murder of Jenkins, the attempted murder of Williams, and carrying a handgun without a license. Gray filed a motion to suppress the evidence obtained as a result of the warrantless stop, arguing Officer McDonald did not have reasonable suspicion. After a hearing, the trial court denied the motion.

The case was tried to a jury, and Gray renewed his objection to the evidence obtained as a result of the warrantless stop. That evidence was admitted over his objection, and he was found guilty as charged. The trial court entered judgments on the murder and attempted murder counts, but not the carrying a handgun without a license count due to double jeopardy concerns.

*Gray v. State*, 927 N.E.2d 431 (Ind. Ct. App. 2010); ECF 13-6 at 2-4.

In the amended petition, Gray argues that he is entitled to habeas relief because trial counsel provided ineffective assistance by failing to suppress the show-up identification by Keisha Journey, failing to investigate video footage recorded for a television show, failing to object to improper aggravators at sentencing, and failing to advise him of his right to testify at trial. He further argues that he is entitled to habeas relief because appellate counsel provided ineffective assistance by failing to challenge his sentence and by failing to consult with him regarding appellate arguments.

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round

of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

On direct appeal, Gray presented none of his habeas claims to the Indiana appellate courts. ECF 13-3; ECF 13-7. On post-conviction review, he appealed the denial of his petition for post-conviction relief to the Indiana Court of Appeals, and he presented only his claims that trial counsel failed to suppress the show-up identification and failed to advise him of his right to testify at trial and his claim that appellate counsel failed to challenge his sentence. ECF 13-11. In his petition to transfer to the Indiana Supreme Court, he presented only his claims that trial counsel failed to suppress the show up identification and that appellate counsel failed to challenge the sentence. ECF 13-14.

Consequently, Gray did not present at each State court level his claims that trial counsel failed to investigate video footage recorded for a television show, failed to object to improper aggravators at sentencing, and failed to advise him of his right to testify at trial or his claim that appellate counsel failed to consult with him regarding appellate arguments. Because Gray did not properly assert these claims at each level of the State court, they are procedurally defaulted. Gray does not assert any excuse to

procedural default, so the court will not further consider the procedurally defaulted claims.

STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

DISCUSSION

Ineffective Assistance of Trial Counsel – Show-Up Identification

Gray argues that he is entitled to habeas relief because trial counsel failed to object to the show-up identification of Keisha Journey as unduly suggestive. To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v.*

6

*Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

On May 14, 2009, trial counsel moved to suppress the evidence obtained in connection with the traffic stop in which Gray was arrested. ECF 13-1 at 10-11. The evidence sought to be suppressed included DNA findings obtained from his shoes and the show-up identification of Keisha Journey. ECF 14-2 at 108-10. After an evidentiary hearing, the trial court denied the motion to suppress. ECF 13-1 at 12; ECF 17-3 at 25-79.

The jury trial occurred on July 27 and July 28, 2009. ECF 17-2; ECF 17-3; ECF 28-1. The prosecution presented a crime scene specialist who testified that she took several photographs and filmed the shooting location at 917/919 North Dearborn Street shortly after the shooting occurred. ECF 28-1 at 35-63. She collected bullet casings from the shooting location. *Id.* She also took photographs of the duplex shared by Gray and the deceased victim at 813/815 North Dearborn Street. *Id.* She collected a bullet casing, a set of keys, and clothing from this duplex. *Id.* She then went to the police department to photograph Gray and to collect his clothing, and trial counsel lodged a continuing objection to evidence obtained as a result of the traffic stop. *Id.*

David McDonald testified that Anthony Jenkins, the deceased victim, lived in a duplex across the street from him. *Id.* at 65-82. On September 16, 2008, he saw Jenkins with Gray, who lived on the other side of the duplex. *Id.* He recognized Gray from the neighborhood and knew that he drove a blue Camaro. *Id.* Jenkins went inside his

duplex and then shoved Gray, who was nude, outside. Gray went into his side of the duplex. *Id.* Jenkins walked north on Dearborn Street and came back. Gray came out on his front porch and looked both ways on Dearborn Street and went back inside. *Id.* Two minutes later, Gray went north in the alley with "tight dreads" wearing a black tee and blue jean shorts. *Id.* Less than five minutes later, he heard multiple gunshots. *Id.* He ran about a block away where he found a man yelling about his leg and Jenkins face down on the sidewalk. *Id.*

Wayne Williams, the surviving victim, testified that Jenkins was his nephew. *Id.* at 91-113. His brother also lived on Dearborn Street a half block away from the deceased victim. *Id.* On September 16, 2008, he was working on his brother's car as his brother's wife, Keisha Journey, assisted him. *Id.* Jenkins arrived and told him that he had caught someone coming through his window, that he had forced him to get naked and leave, and that it had "just happened." *Id.* According to Williams, a friend had broken Jenkins' front window. *Id.* Jenkins left but returned ten to fifteen minutes later on his bicycle on the sidewalk in front of Journey's house as Williams parked his truck across the street. *Id.* Williams heard shots, turned around, and saw someone shooting Jenkins. *Id.* Jenkins was on the ground as the shooter continued to shoot him. *Id.* He ran over and grabbed the shooter from behind, and the shooter shot him in the thigh, causing profuse bleeding, including spraying. *Id.* When the shooter tried to shoot again, Williams heard a click as if he had run out of bullets. *Id.* He described the shooter as a slender with "braids or maybe dreads hanging" wearing white tennis shoes, a black shirt, and blue jeans. *Id.* The shooter ran north on Dearborn Street. *Id.*

Keisha Journey testified that she stood at her front door with her daughter as somebody ran down the sidewalk toward her with a silver gun and started shooting at Jenkins. *Id.* at 121-34. Jenkins fell after the second shot. *Id.* When she saw the shooter, he stood about the same distance between her and the prosecutor at trial. *Id.* At trial, she identified the shooter as Gray. *Id.* When Williams grabbed Gray, he shot him twice. *Id.* Journey heard clicks as Gray kept trying to shoot Williams. *Id.* Gray ran back north in the direction from which he came. *Id.* Over trial counsel's renewed objection, she testified that, later, the police took her a couple blocks away to an unmarked police car, where she identified Gray as the shooter, though he was wearing a different shirt. *Id.* On cross-examination, she testified that her attention was drawn to the gun, that she wanted to keep her five-year old daughter safe, and that she saw Gray in a white shirt during the shooting. *Id.* at 134-48.

Officer Leepper testified that he had happened to drive by Dearborn Street when civilians flagged him to come to an area where two individuals laid on the ground bleeding. *Id.* at 150-74. Williams had a life-threatening wound and was in and out of consciousness, and he saw Jenkins draw his last breath. *Id.* He established an inside perimeter for the immediate crime scene and conveyed the civilians' description of the shooter. *Id.* He also set an outer perimeter to search for the shooter. *Id.* About thirty minutes later, Officer McDonald informed him that he had detained an individual. *Id.* Over trial counsel's renewed objection, he testified that he saw Gray handcuffed on the side of the road with blood on his arms and legs. *Id.* Gray was "dragging his arms and

legs across the concrete."[1] *Id.* He also went to the duplex at 813/815 North Dearborn Street and saw the 815 half had a shattered front window. *Id.* He saw a blue Camaro behind the duplex and a bullet casing in between the two doors of the duplex. *Id.* He went inside the Jenkins' apartment and saw clothing on the ground in front of the front door. *Id.*

Officer McDonald testified that he assisted with monitoring the outer perimeter to look for the shooter. *Id.* at 187-200. As he drove away, he immediately encountered a Lincoln Towncar stop in the middle of the road just after an intersection, and he saw an individual matching the shooter's description walking toward that vehicle. *Id.* At trial, he identified the individual as Gray. *Id.* Officer McDonald asked him to step out of the vehicle, and he placed him in handcuffs. *Id.* Over trial counsel's objection, he testified that he saw small drops of blood on Gray's arms and legs but no injury. *Id.*

Detective Tudor testified that he spoke with Keisha Journey when he arrived at the shooting location. *Id.* at 203-21. He arranged show-up identifications for several witnesses, including Journey and Joyce Dunn. *Id.* He also went to 815 North Dearborn Street to interview David McDonald and confirmed that the deceased victim lived at that address. *Id.* The pair of pants collected from the duplex including a set of keys. *Id.* He also confirmed that Gray had registered the blue Camaro. *Id.* The set of keys fit the Camaro. *Id.*

---

[1] At the suppression hearing, Officer Leepper testified, "The Defendant had blood splatter on his arms and his legs and was trying to rub it off on the concrete as we were standing their talking to him . . . . He was scraping his arms and legs down the side of the curb." ECF 17-3 at 35-36.

Dr. Sozio, forensic pathologist, testified that he conducted an autopsy on the deceased victim. *Id.* at 242-50; ECF 17-2 at 2. He observed gunshot wounds where the bullet entered at the neck, the left arm, the right side of the back, the left side of the back, and the buttocks for a total of five gunshot wounds. *Id.* He recovered a bullet from the left arm. *Id.* Jenkins died due to multiple gunshot wounds to the chest and abdomen. *Id.*

Michael Ray Putzek, firearms expert, testified that three of the bullet casings found at the shooting location and the bullet casing found at the 813/815 North Dearborn Street duplex were fired from the same gun. ECF 17-2 at 6-34. The bullet found in Jenkins' body was consistent with bullet casings in that they could all be used in the same gun. *Id.* There are numerous ways that a casing could jam the gun or not fully eject, and, in such cases, it would be possible to manually extract the casing from the gun. *Id.*

Jeff Ellenberger testified that he was mowing grass about four houses away from where Journey lived. *Id.* at 40-51. After observing the shooting, he assisted Williams with his wound, which was "squirting out" blood, by administering a tourniquet. *Id.* He compared the bleeding to a weak spray bottle. *Id.* Shelley Crispin, forensic examiner, found that the stains on the shoes worn by Gray at the time of his arrest matched Williams' DNA. *Id.* at 66-86.

Trial counsel presented Joyce Dunn who testified that she saw the shooting from her front yard. *Id.* at 102-23. The shooter shot Williams' twice, and blood went everywhere, including on the shooter. *Id.* A detective took her two streets away, and she

declined to identify the detainee as the shooter. *Id.* According to Dunn, a beautician, the shooter has longer and cleaner cut dreadlocks, while the detainee had "pegged back" "Stacey braids." *Id.* It would have been impossible to change hairstyles because dreadlocks are so matted that they must be shaved off to be removed. *Id.* The shooter looked older and stockier with a mustache. *Id.* She was "a hundred percent sure" that Gray was not the shooter. *Id.* On cross-examination, she testified that the shooting did not occur in front of Journey's house. *Id.* at 123-34. She heard the shooter say, " I told you I'd find you, motherfucker." *Id.* She did not recall a bicycle. *Id.*

At closing, trial counsel challenged the reliability of the show-up identification as follows:

> What did Keisha Journey testify to? Well, she said the shooter had braids or dreads or twisties or whatever you call them. Think that's a good look? Think that's a good description? Braids or dreads or twisties or whatever. And what did she say, his shirt? She said his shirt was a white shirt. She said, I'm there on my doorstep and I see a shooter with a white shirt on shoot my little cousin. Did anyone else say the shooter had a white shirt? No. The shooter had a black shirt. And you see that shooting and be that wrong about that simple of a detail? Why would she be wrong, you might ask. Why would she say she was there and saw everything when she didn't? Well, her little nephew got shot. The police grabbed somebody up and said, hey do you think this might be the guy? What is she going to say? She wants to believe, so she wants to believe they just grabbed up the guy that murdered [the deceased victim]. But she's wrong. What else did she say? She said her five-year old daughter is on the porch in front of her. And she looked up and she saw a silver gun. Think she took a long look at that silver gun, and a long look at the shooter's face, and analyzed what his hair looked like, or do you think she grabbed her little girl to get her little girl the hell out of the way of a mad gunman firing on the street? Think she grabbed her little girl, she ran inside, she heard gunshots, and she called 911. She came out and she saw her little nephew dead, and she was heartbroken like we all would be. But she was wrong about who did it.

12

Let's talk about show-ups, the procedure of a show-up. The police in uniform surround a person, a suspect, a suspect, in their term, got him cuffed, sit him on the curb, say sit there, shut up, don't say anything. Detectives drive by in a car fifty feet away and say, he, you know, Mr. McDonald, he thought his kids might have just got shot, but forget all that, what do you think, think this guy out to be the shooter? Take Keisha Journey, who ran off the porch to save her little girl and saw a silver gun and a white shirt. But do you think this kid here is the shooter, surrounded by cops? Think that's a trustworthy I.D.?

*Id.* at 171-73.

On direct appeal, Gray challenged the admission of evidence obtained at the traffic stop. ECF 13-3 at 12-22. The Indiana Court of Appeals rejected the argument, finding that the police had reasonable suspicion to conduct the traffic stop. ECF 13-6 at 4-9.

At the post-conviction stage, trial counsel testified as follows:

**PCR Counsel:** Now since you were on the case a few months prior to proceeding to trial, do you have any recollection of if there were any pretrial motions? Hearings on pretrial motions?

**Trial Counsel:** I don't recall specifically what pretrial stuff was done before I took over. I did this motion to suppress the stop
.
**PCR Counsel:** You did do the motion to suppress?

**Trial Counsel:** Yes.

**PCR Counsel:** Okay.

**Trial Counsel:** That was the big pretrial motion.

**PCR Counsel:** That was your big pretrial motion? Let me ask you, prior to proceeding to trial, was that your main strategy or theory in the case to try to get the stop suppressed?

**Trial Counsel:** I mean, if you can suppress a stop, that's always a big thing. So, it was like the major thing to do before going to trial.

**PCR Counsel:** Do you recall the substance of what your motion to suppress was about?

**Trial Counsel:** The description of the shooter was pretty varied depending on who the police talked to. And therefore they shouldn't have had the basis to stop Mr. Gray.

**PCR Counsel:** So it was probable cause for the stop?

**Trial Counsel:** Yes.

**PCR Counsel:** And it's fair to say that your suppression was denied, correct?

**Trial Counsel:** Yes, it was denied.

**PCR Counsel:** And that was not just the day before or a couple of days before the trial. That was a while prior to the trial, correct?

**Trial Counsel:** Yes.

**PCR Counsel:** So you knew in advance that that evidence would be coming in, correct?

**Trial Counsel:** Yes.

**PCR Counsel:** In that suppression that you did with the probable cause to stop Mr. Gray, do you recall if you also tried to suppress the show-up identification in this case?

**Trial Counsel:** I don't think I specifically tried to suppress the show-up because the goal was if the stop was suppressed that would, by itself, suppress the show-up ID that happened later.

**PCR Counsel:** So, to be fair, you don't think that was addressed in the suppression specifically?

**Trial Counsel:** No, but I mean, if we won the original stop then there wouldn't have been the show-up, so it would have gone away.

ECF 14-2 at 108-10.

On post-conviction appeal, the Indiana Court of Appeals rejected the claim that trial counsel erred by not specifically challenging the show-up identification, finding no deficient performance because Gray faced Journey during portions of the shootings, which occurred in the mid-afternoon, and unequivocally identified Gray as the shooter at trial. ECF 13-13 at 5-9. The appellate court further found no prejudice given the other evidence presented at trial. *Id.*

After reviewing the record, the court cannot find that the State courts unreasonably determined this ineffective assistance of counsel claim.

> The right to a fair trial, guaranteed by the Due Process Clause of the Fourteenth Amendment, is violated if unduly suggestive identification techniques are allowed to taint the trial. To determine whether such a violation has occurred, we conduct a two-step inquiry. The first question is whether the identification procedure used by law enforcement was both suggestive and unnecessary. If so, we then decide, based on the totality of the circumstances, whether the identification was sufficiently reliable to outweigh the effect of the tainted procedure.

*Holloway v. City of Milwaukee*, 43 F.4th 760, 765–66 (7th Cir. 2022). "[The Seventh Circuit has] recognized that showups may not be unduly suggestive under certain circumstances." *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007). "One such extraordinary situation is confirming that an individual apprehended close in time and proximity to the scene of a crime is, in fact, the suspected perpetrator of the crime." *Id.* "In assessing the reliability of an identification despite unduly suggestive pre-trial procedures, we must consider the five so-called *Biggers* factors: (1) the witness' opportunity to view the suspect at the scene of the crime; (2) the witness' degree of attention at the scene; (3) the accuracy of his pre-identification description of the

suspect; (4) the witness' level of certainty in the identification; and (5) the time elapsed between the crime and the identification." *United States v. Rogers*, 387 F.3d 925, 938 (7th Cir. 2004) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)).

On post-conviction appeal, Gray argued that the manner in which the show-up identification was conducted was unduly suggestive (ECF 13-11 at 34-46), but it appears that Gray was apprehended "close in time and proximity to the scene of the crime" as contemplated by *Hawkins*. He also took issue with several of the reliability factors, suggesting that Journey was more focused on the gun and keeping her daughter safe, that she merely "thought" that Gray was the shooter at the show-up identification, and that her description of the shooter as wearing a white shirt conflicted with other witnesses' reports that the shooter wore a black shirt. However, the court cannot find that these points render the State court decision unreasonable. Journey testified that she saw the shooter in close proximity and that the shooter had turned her way. While she testified at trial that she believed the shooter wore a white shirt, there is no definitive answer as to the color of the shooter's shirt, and there is no indication she believed, on the day of the show-up identification, that the shooter wore a black shirt. Further, safety concerns during the course of a violent crime do not render identifications inherently unreliable given that victims of violent crimes routinely identify their assailants both in and out of court. Moreover, the record suggests that Journey identified Gray as the shooter by saying, "That's him. I really think it is."[2] ECF 14-2 at 92.

---

[2] The record is somewhat murky on this point. On post-conviction appeal, Gray represented that Journey said, "I think he is the shooter," citing the post-conviction transcript. ECF 13-11 at 40. The cited

As an analogous case, Gray relies on *Rodriguez v. Young*, 906 F.2d 1153 (7th Cir. 1990). In *Rodriguez*, the trial court admitted a woman's testimony regarding a photographic identification of the defendant as the murderer the morning after the murder occurred even though she only saw the murderer from the back and recognized the defendant only from seeing other photographs of the defendant. *Id.* at 1156-58. The Seventh Circuit found that the failure to move to suppress this identification amounted to deficient performance. *Id.* at 1161. However, the Seventh Circuit went on to find that "[t]hough it may have been a close question, [the woman's] testimony was probably admissible and its credibility and weight a matter for the jury." *Id.* The Seventh Circuit's characterization of the suppression issue in *Rodriguez* as a close question strongly implies that the suppression issue in this case was not particularly close. Unlike the witness in *Rodriguez*, Journey saw Gray's face in person during the course of the shooting and identified him in person less than two hours later.

The court further observes that trial counsel did challenge the show-up identification in some respect by challenging the traffic stop and that trial counsel properly preserved the issue for appeal. Trial counsel also highlighted many of these reliability concerns on cross-examination and further undermined Journey's testimony

---

transcript illustrates that post-conviction counsel asked whether trial counsel recalled that Journey said, "That's him, I really think it is," in the video recording of the show-up identification. ECF 14-2 at 92. Trial counsel replied that she recalled Journey saying, "I think that's him." *Id.*

It does not appear that the video recording of the show-up line up is part of the State court record. Significantly, this post-conviction evidentiary hearing occurred more than a decade after trial. While trial counsel's recollection of this detail in her capacity as a witness would understandably be faulty, it seems less likely that post-conviction counsel, who had clearly prepared for the hearing in her capacity as counsel, would have misquoted the video recording.

by calling Joyce Dunn and at closing argument. The court also agrees that the other evidence against Gray was compelling. Gray had a clear motive for the shooting, and he was seen heading in the direction of the shooting shortly after the botched burglary and shortly before the shooting occurred. A bullet casing matching those used in the shooting was found at Gray's residence. Gray showed consciousness of guilt by attempting to scrape the blood from his arms and legs on the concrete after he was detained. Perhaps most critically, Williams' DNA was found on the blood sprayed on Gray's shoe. And, even assuming that trial counsel could have suppressed the out-of-court identification as unduly suggestive, Gray does not challenge her separate identification of him as the shooter at trial. *Swigeart v. State*, 749 N.E.2d 540, 544 (Ind. 2001) ("Nevertheless, a witness who participates in an improper pretrial identification procedure may still identify a defendant in court if the totality of the circumstances shows clearly and convincingly that the witness has an independent basis for the in-court identification."). As a result, this claim is not a basis for habeas relief.

Ineffective Assistance of Appellate Counsel – Sentencing

Gray argues that appellate counsel erred by failing to seek reconsideration of his sentence under Ind. App. R. 7(b) and by failing to challenge the trial court's consideration of aggravating and mitigating factors. According to Gray, the trial court should have credited his youth, difficult childhood, and mental health as mitigators and should not have considered his juvenile history as an aggravator. He further argues that the sentencing court should not have considered multiple shots as an aggravator for the attempted murder conviction.

Under Indiana law at the time of the shooting, a person convicted of murder could be sentenced to a range of 45 to 65 years with an advisory sentence of 55 years. Ind. Code § 35-50-2-3(a) (2008). Attempted murder was a Class A felony, and a person convicted of a Class A offender could be sentence to a range of 20 to 50 years with an advisory sentence of 30 years. Ind. Code § 35-41-5-1(a) (2008).

According to Indiana law, trial courts may consider the following sentencing factors:

(a) In determining what sentence to impose for a crime, the court may consider the following aggravating circumstances:

(1) The harm, injury, loss, or damage suffered by the victim of an offense was:

(A) significant; and

(B) greater than the elements necessary to prove the commission of the offense.

(2) The person has a history of criminal or delinquent behavior.

* * *

(6) The person has recently violated the conditions of any probation, parole, pardon, community corrections placement, or pretrial release granted to the person.

* * *

(b) The court may consider the following factors as mitigating circumstances or as favoring suspending the sentence and imposing probation:

* * *

(10) Imprisonment of the person will result in undue hardship to the person or the dependents of the person.

* * *

(c) The criteria listed in subsections (a) and (b) do not limit the matters that the court may consider in determining the sentence.

Ind. Code § 35-38-1-7.1 (2008).

Under Indiana law, appellate courts may revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. R. App. P. 7(B). "The principal role of Appellate Rule 7(B) review should be to attempt to leaven the outliers." *Wilson v. State*, 157 N.E.3d 1163, 1181 (Ind. 2020). "Because the number of counts that can be charged and proved is virtually entirely at the discretion of the prosecution, appellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id.* "Whether a sentence should be deemed inappropriate turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020).

At sentencing, the trial court found the following aggravating and mitigating factors:

- The trial court found that Gray's youth was a mitigating factor but not a substantial one due to his criminal history.

- The trial court found that Gray's fatherhood was a mitigating factor but not a substantial one because he did not comply with his legal obligations with respect to the child.

- The trial court found that the undue hardship Gray would suffer as a result of a harsh sentence was a mitigating factor but not a substantial one due to the nature of the offense and his criminal history.

- The trial court found that Gray's difficult childhood coming from a "broken home" and suffering "significant educational difficulties" was a significant mitigating factor.

- The trial court found that Gray's criminal history since age eleven was an aggravating factor, including carrying a handgun without a license and resisting law enforcement.

- The trial court also found that Gray was arrested on a possession of cocaine charge and also committed the murder and attempted murder while on probation for resisting law enforcement and violated the terms of probation by testing positive for drugs and failing to report for drug testing.

- The trial court found that the nature of offense was an aggravating circumstance that included multiple shots fired at multiple victims.

ECF 17-2 at 229- 39.

The trial court concluded by finding that the aggravating factors outweighed the mitigating factors. *Id.* It sentenced Gray to 55 years on the murder conviction and 35 years on the attempted murder conviction and ordered the sentences to run consecutively. *Id.* No challenge to sentencing was raised on direct appeal. ECF 13-3.

At the post-conviction stage, Gray argued that trial court abused its discretion by considering his criminal history to be aggravating when it was closely linked to his troubled childhood, which was found to be mitigating. ECF 13-11 at 50-54; ECF 13-14 at 9-12. He also argued that the circumstances of the attempted murder were unremarkable and should not have been an aggravator for that offense. *Id.* The Indiana Court of Appeals found no evidence connecting his childhood to his substantial

21

juvenile and criminal record. ECF 13-13 at 11-15. The appellate court also disagreed that the nature of the attempted murder was unremarkable, noting that Gray shot an unarmed victim who was trying to protect his family and that mere embarrassment prompted the shooting. *Id.* With respect to the claim that appellate counsel should have raised an argument under Ind. R. App. P. 7(B), the appellate court found no prejudice, reiterating that Gray had a substantial criminal history and that the nature and circumstances of the offenses were valid aggravating factors. *Id.*

After reviewing the record, the court cannot find that the State court rendered an unreasonable decision on these claims. To start, the trial court expressly considered Gray's youth and troubled childhood as mitigators. Gray cites his pre-sentence investigation report for mental health issues, but review of this report indicates only his drug use, which the trial court considered, as well as potential attention deficit disorder and participation in anger management counseling. ECF 21-2 at 9-19. Additionally, Indiana statute expressly allows trial courts to consider "criminal and delinquent behavior," which includes juvenile adjudications. *See Anderson v. State*, 798 N.E.2d 875, 880 (Ind. Ct. App. 2003) ("Therefore, we do not find that the trial court improperly considered Anderson's juvenile criminal history as an aggravating circumstance in sentencing him.").

Gray also invokes *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), for the proposition that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." However, Gray was not sentenced

beyond the statutory maximum, rendering *Apprendi* a nullity in this case. Further, Gray suggests that the trial court erroneously found that he committed the murder and attempted murder when he was on probation, but the electronic docket for the State courts[3] indicate that, in Case No. 49G06-0801-CM-23386 he pled guilty and was placed on probation in January 2008 and that it was revoked in August 2009, about one year after the shooting occurred. Though Gray was not convicted of cocaine possession in Case No. 49G06-0804-FC-74432, this case remained pending at the time of sentencing, and the cocaine possession likely qualified as a probation violation.

Gray's contentions that he did not intend to kill Williams[4] and did not fire multiple shots at him are also undermined by the record. Journey and Joyce Dunn each testified that Gray shot at Williams' twice, and Journey and Williams testified that Gray tried to continue shooting Williams but was unable to do so apparently due to a problem with the gun. The court also agrees that the nature and circumstances of the crimes were particularly senseless in this case as they were motivated by a briefly humiliating experience that was precipitated by an attempted burglary. This experience merely consisted of walking nude from one side of the duplex to the other, and, while certainly embarrassing, Jenkins showed remarkable grace by refraining from calling the police on Gray while he was on probation and may have been entitled to use deadly

---

[3] Pursuant to Fed. R. Evid. 201, the court takes judicial notice of the electronic dockets for the Indiana courts, which are available at https://public.courts.in.gov/mycase/.

[4] Notably, this argument challenges the validity of the jury verdict rather than the validity of the sentencing decision of the trial court, and appellate counsel specifically challenged whether the trial record contained sufficient evidence to support a finding that Gray intended to kill Williams on direct appeal. ECF 13-4 at 18-20.

force against Gray. *See* Ind. Code § 35-41-3-2(b) (2008) ("A person is justified in using reasonable force, including deadly force, against another person; and does not have a duty to retreat if the person reasonably believes that the force is necessary to prevent or terminate the other person's unlawful entry of . . . the person's dwelling."). Gray suggests that this humiliation did not motivate him to shoot Williams, but the shootings occurred in quick succession, and, at base, it is why both shootings occurred.

The analysis under Ind. R. App. P. 7(B) similarly relies on consideration of the nature and circumstances of the offense and the defendant's character, and, for similar reasons, the court cannot characterize the State court analysis as unreasonable. The court further observes that the primary purpose of this rule is to eliminate outlier sentences. In raising this argument at the post-conviction stage, Gray cited the following cases: *Brown v. State*, 10 N.E.3d 1 (Ind. 2014) (reducing 16-year old's 150-year sentence for two counts of murder and one of robbery to 85 years); *Fuller v. State*, 9 N.E.3d 653 (Ind. 2014) (reducing 15-year old's 150-year sentence for two counts of murder and one count of robbery to 85 years); *Taylor v. State*, 86 N.E.3d 157 (Ind. 2017) (reducing 17-year-old's sentence from life without parole to 80 years); *Wilson v. State*, 157 N.E.3d 1163 (Ind. 2020) (reducing 16-year-old Wilson's sentence from 181 years to 100 years). Unlike these offenders, Gray was not a juvenile at the time of the offense but had aged into adulthood if only just. *See Roper v. Simmons*, 543 U.S. 551, 574 (2005) ("The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn.").

Additionally, his aggregate sentence of 90 years is squarely within the range of the sentences reduced under Ind. R. App. P. 7(B) in the cases upon which Gray relies.

Accordingly, the claim that appellate counsel failed to challenge sentencing is not a basis for habeas relief.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Gray to proceed further.

For these reasons, the court DENIES the amended habeas corpus petition (ECF 10); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on 9/18/2024

s/ Cristal C. Brisco
JUDGE
UNITED STATES DISTRICT COURT